**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Brenda Temple,                                )        No. CV-12-2357-PHX-SMM
                                              )
        Plaintiff,                            )
                                              )
v.                                            )        **MEMORANDUM OF DECISION**
                                              )        **AND ORDER**
Hartford Ins. Co. of the Midwest, et al.,     )
                                              )
        Defendants.                           )
                                              )
_____)

        Pending before the Court is Defendants' motion for summary judgment, which is fully briefed.  (Docs. 64-65, 71-75.)  Also pending is Defendants' motion to strike Plaintiff's expert, which is fully briefed.  (Docs. 66-68.)  After reviewing the briefs and having determined that oral argument is unnecessary,[1] the Court will deny Defendants' motion for summary judgment and deny Defendants' motion to strike Plaintiff's expert.

## MOTION TO STRIKE

        Defendants separately move to strike Plaintiff's expert, Frank Weedon.  (Doc. 66.)  Pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Defendants contend that Mr. Weedon is not qualified to render an expert opinion on the claims handling aspects of Arizona's workers' compensation system.  (Id.)  Plaintiff opposes the motion to strike and Defendants have replied in support.  (Docs. 67, 68.)

_____

        [1]The request for oral argument is denied because the parties have had an adequate opportunity to present their written arguments and oral argument will not aid the Court's decision.  See Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev., 933 F.2d 724, 729 (9th Cir. 1991).

The District's Local Rules permit a motion, a response, and a reply. LRCiv 7.2(b)-(d). They further provide that motions objecting to, arguing about, or seeking to strike evidentiary matters be raised "in the objecting party's responsive or reply memorandum and not in a separate . . . filing." Id. 7.2(m)(2).   "The purpose of LRCiv 7.2(m) (1) is to require unitary briefs, including objections to evidence and to the propriety of arguments, within the page limits or beyond them by leave of the court." Pruett v. Arizona, 606 F.Supp.2d 1065, 1074 (D. Ariz. 2009). Litigants may not divide their briefs and multiply their page limits by styling part of the argument as a separate motion to strike.  See Custom Vehicles, Inc. v. Forest River, Inc., 464 F.3d 725, 727–28 (7th Cir. 2006) (Easterbrook, J.) (stating that a "motion to strike" that is argument for the lack of merit of the underlying motion is unauthorized and improper).   Whether an unauthorized filing should be stricken is within the Court's discretion. See Golden Gate Hotel Ass'n v. City and Cnty. of San Francisco, 18 F.3d 1482, 1485 (9th Cir. 1994).

The Court finds that Defendants have violated the District's Local Rule by dividing their briefs and multiplying their page limits by styling part of their argument as a separate motion to strike.  The Court will exercise its discretion and will deny Defendants' motion to strike the testimony of Plaintiff's expert, Frank Weedon.

Moreover, in this case, Mr. Weedon is qualified to provide his testimony as an expert under Fed. R. Evid. 702, Daubert, 509 U.S. 579, and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Trial judges have a responsibility to act as gatekeepers to exclude all types of unreliable expert testimony. Fed. R. Evid. 702 (Advisory Committee's Notes 2000 Amendments). To exercise

this responsibility, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." <u>Kumho Tire</u>, 526 U.S. at 152.

Daubert sets forth a two-part test for admitting expert testimony that focuses on the reliability and relevancy of the opinion.  To be sufficiently reliable, the opinion must be based on "scientifically valid principles." 509 U.S. at 595.   Factors that courts have used to evaluate the reliability of an expert's methods include:  1. Whether the expert's method is falsifiable or merely conclusory; 2. Whether the technique has been subject to peer review and publication; 3. The known or potential error rate of the technique; 4. The existence and maintenance of standards and controls; 5. Whether the technique has general acceptance in the relevant expert community; 6. Whether the substance of the testimony was prepared specifically for the instant litigation; 7. Whether the expert's extrapolation from an accepted premise to his conclusion was justifiable; 8. Whether the expert has adequately accounted for obvious alternative explanations; 9. Whether the expert is being as careful as he would be in his professional work outside his paid litigation consulting; 10. Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.  <u>See</u> <u>id.</u> at 593-95; <u>Daubert v. Merrill Dow Pharm.</u>, 43 F.3d 1311, 1317 (9th Cir. 1995); <u>Claar v. Burlington N.R.R.</u>, 29 F.3d 499, 502-03 (9th Cir. 1994); <u>see also</u> <u>Kumho Tire</u>, 526 U.S. at 149-151.  In <u>Kumho Tire</u>, the Court extended such <u>Daubert</u> analysis to all expert testimony of "specialized knowledge" even if decidedly non-scientific.

To be relevant, the testimony must "assist the trier of fact to . . . determine a fact in issue." <u>Daubert</u>, 509 U.S. at 592.  The requirement that the opinion testimony assist the trier of fact goes primarily to relevance. <u>See</u> <u>Primiano v. Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010). Shaky but admissible expert opinion evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.  <u>Id.</u>

First, the Court finds that Mr. Weedon's opinions are sufficiently the product of reliable principles and methods.  Mr. Weedon is familiar with well-known, industry-wide standards for investigating and handling workers' compensation claims. The standards of

conduct for insurers and adjusters in Arizona follow the National Association of Insurance Commissioners ("NAIC") model rules, which were adopted in the Arizona Unfair Claims Settlement Practices Act, A.R.S. § 20-461 (2012). These standards are national as they have been adopted in forty-six of the fifty states, including Arizona, Texas, and Louisiana, where Mr. Weedon is licensed. Albeit in Texas, Mr. Weedon has over twenty years of experience in the workers' compensation industry, including as a licensed adjuster and board-certified attorney, who has represented and advised various workers' compensation carriers and adjusters regarding claims handling practices, taught workers' compensation adjusters (from multiple jurisdictions) the standards for handling claims in good faith, and also represented injured workers. (See Docs. 67-1 and 67-2.)

Next, the Court finds that Mr. Weedon's technical and other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Both Arizona law and Ninth Circuit law recognize that experts in the area of insurance claim handling are proper, that they may testify regarding the application of industry standards to claim handling, and that they may refer to legal precedent to the extent necessary to explain the facts of their opinions. See, e.g., Rawlings v. Apodaca, 151 Ariz. 149, 158, 726 P.2d 565, 574 (1986) (stating that an insurer's compliance with industry standards may be relevant to the question of an insurer's alleged bad faith); Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (relying upon claims handling expert and holding that "Defendants deviat[ion] from industry standards supported a finding that they acted in bad faith")

Thus, the Court finds that Mr. Weedon's expert testimony is sufficiently reliable and relevant and his testimony will not be struck from these proceedings.

## FACTUAL BACKGROUND

The following facts are undisputed except as noted. Plaintiff Brenda Temple ("Temple") worked as a customer service representative for Stanley Steemer. (Doc. 72-1 at 4-5.) In order to get to her duty station at the call center, a sedentary position, Temple needed to walk up two flights of stairs. (Doc. 65-2 at 32.) Temple states that on her way to

her duty station on January 9, 2012, she tripped and fell while walking up a flight of stairs. (Doc. 72-1 at 6-7.)  Temple further states that when she fell on the stairs, she injured her knees and hip, and twisted her back.  (Id.)  Temple called for help and a co-worker, Jason Williams, came to assist her and help her up from her fall.  (Id. at 7.)  Temple reported her injury to assistant supervisor, Jody Warren, who initiated a work injury report.  (Id. at 8-9; Doc. 65-2 at 26.)

That same day, Temple sought medical treatment at a walk-in minor emergency clinic with Dr. Gary Kohring.  (Doc. 72-2.) Dr. Kohring reported that Temple's left knee was strained with swelling and pain radiating into her back.  He prescribed medication and kept her off work until January 11th.  (Id.)

The next day, on January 10th, Temple went to see Linda Pachuta, a nurse practitioner at the Mayo Clinic, who examined and treated her. (Doc. 72-3 at 42-45.) Pachuta prescribed medication, physical therapy, a knee brace and directed Temple to stay home and rest for the next week and was given a work restriction to that effect.  (Id. at 45.)

Defendant Hartford ("Hartford") is Stanley Steemer's workers' compensation insurance carrier; Defendant Gallagher Bassett ("Gallagher Bassett") served as Hartford's claims handler. (Doc. 65-2 at 29-30.) Gallagher Bassett assigned Tonya Murray ("Murray") to adjust the workers' compensation claim submitted on behalf of Temple.  (Id.) Murray then commenced her investigation into Temple's claim and recorded her investigative activities in a claim notebook. (Doc. 65-2 at 29; id. at 9-30.)

Murray spoke with Temple on January 18, 2012, and Temple recounted how she came to be injured and that she hurt her left knee, left hip and back.  (Id. at 26.)  Temple reported that she had no prior injuries to the same body part as was part of her claim for workers' compensation. (Id.)  On January 18, 2012, Murray initiated with Mayo Clinic's medical records department to request Temple's medical records and was advised that Mayo Clinic would not release any medical records without a HIPAA medical authorization despite her explanation that workers' compensation does not fall under HIPAA. (Id. at 24.) On January 18, 2012, Murray also wrote to Temple's nurse practitioner, Linda Pachuta at the Mayo

Clinic, requesting medical documentation regarding Temple's medical status.  (Id. at 31.)

On January 23, 2012, Nurse Pachuta forwarded a work restriction for Temple for January 17, 2012 through February 6, 2012 due to recent work-related injury.  (Doc. 72-3 at 37.)  On January 25, 2012, Nurse Pachuta forwarded another work restriction for Temple due to work-related injury for the same dates stating that Temple is unable to sit at desk, walk up stairs or stand for long periods due to worsening pain.  (Id. at 36.)

On January 24, 2012, Murray faxed a note to Nurse Practitioner Pachuta.  (Doc. 65-2 at 32.)  Murray acknowledged Pachuta's unable to work restriction for Temple from January 17 to February 6, 2012.  (Id. at 32; Doc. 72-3 at 36-37.)  Murray requested Pachuta to provide clarification regarding why Temple was unable to perform her work duties, given that her job was sedentary and her employer was willing to accommodate light duty.  (Doc. 65-2 at 32.)  Nurse Pachuta's responded stating that Temple was unable to work due to *her work related injury*.  (Doc. 72-3 at 36) (emphasis added).  Temple was unable to sit at a desk, walk up stairs, or stand for long periods due to worsening pain.  (Id.)  Without first speaking to Nurse Pachuta, Murray testified that she believed Nurse Pachuta's work restrictions were unreasonable.  (Doc. 65-3 at 13.)

As of January 24, 2012, based on her investigation to this point, Murray testified that she did not accept Temple's claim for disability benefits due to lack of supporting documentation of a work-related injury.  (Id. at 9; Doc. 72-5 at 9 (Murray testified "There's no confirmation that its related to work" as of January 24th).  Murray further testified that she would have been looking for medical documentation confirming that the injuries reported were directly related to how Temple said the accident happened.  (Doc. 65-3 at 13.)

When asked about this finding, Murray further explained as follows: "Q: Now, you previously told us that you did not agree with the work restrictions given by the doctor or by the Mayo Clinic. Do you recall saying that? A: I said they were unreasonable." "Q: Did you follow what the doctor said? A: I reviewed the recommendation. Q: And you thought it was unreasonable? A: It was unreasonable." (Doc. 72-5 at 11, 13.)  Murray could not describe what additional information she needed to accept Temple's disability benefits claim. "Q: As

1  of -- and as far as something in the report, something that was missing, what did you indicate
2  that you needed to know that was unclear at this point? Having gotten documents from the
3  medical doctors, having talked to the employee, having talked to the employer, what else did
4  you need? A: I wouldn't be able to answer that." (Doc. 72-5 at 8.) Without the benefit of any
5  medical training and without a supporting medical opinion, Murray refused to accept
6  Temple's disability benefits claim. (Id. at 6-7, 11-12.)

7        On January 25, 2012, Murray hired an investigator to conduct surveillance on Temple.
8  (Doc. 65-2 at 36-42.)  Murray advised the surveillance team to contact her if they were
9  "gathering good info to see about an extension if needed." (Doc. 72-4 at 20.)  In her claim
10 notebook, Murray stated:  "I really don't see how someone would be unable to perform
11 sedentary work with a back injury such as this.  I believe we could utilize the results to push
12 for a light duty work release form the physician." (Id.)  The surveillance investigator
13 followed Temple as she went about to various medical appointments and summarized that
14 Temple "moved about freely and with no apparent signs of physical impairment." (Doc. 65-2
15 at 37.)

16       Temple's treating doctor at the Mayo Clinic, Martina Mookadam, testified that its
17 improper for someone who is not involved in her care to be pressuring her to go back to work
18 if she is not ready.  (Doc. 72-8 at 8.)

19       On February 1, Gallagher Bassett again requested records from The Mayo Clinic
20 (Doc. 65-2 at 33) and submitted a first request to another medical provider (Id. at 34).  On
21 February 3, Murray's claim notebook shows that she contacted The Mayo Clinic and was
22 advised that they would not release any information to her.  (Id. at 22.)  Murray further
23 indicated that she deferred a decision on workers' disability compensation until she was able
24 to obtain and review Temple's medical history. (Id. at 21.)  Murray advised Temple that her
25 claim was accepted for medical liability only, pending further investigation.  (Id. at 20.)

26       On February 6, Temple returned for a follow-up appointment with Nurse Pachuta,
27 who concluded that Temple should remain off work.  (Doc. 72-3 at 32-35.)  Murray spoke
28 with The Mayo Clinic on February 9th, 10th and the 21st trying to obtain Temple's medical

records.  (Doc. 65-2 at 16-18.)  On February 20, Temple followed-up with Nurse Pachuta; Pachuta did not report any improvement in her condition, as she continued to have constant pain. (Doc. 72-3 at 28-32.) Pachuta referred Temple to a pain clinic, which she did not receive due to denials by Defendants.  (Doc. 72-12 at 3.)  Murray noted that she did not believe that this would be a benefit to Temple.  (Doc. 72-4 at 29.)

On February 21, Murray spoke with Pachuta, who advised that Temple was on full work restriction until her next follow-up appointment on March 5th.  (Doc. 65-2 at 16.) Murray stated that she disclosed to Pachuta the surveillance report summarizing that Temple was moving around freely.  (Id.)  Regardless of the surveillance report, Pachuta stated that she would not change Temple's  work restrictions.  (Id.)  Dr. Mookadam agreed, testifying that Temple was "not restricted in going in and out of her car or to appointments or to restaurants to eat." (Doc. 72-8 at 12.) In response, Murray decided that Gallagher Bassett needed a second opinion, an IME. (Doc. 72-4 at 29.)

On February 24th, Gallagher Bassett issued a disability benefits denial pending the results of the IME. (Doc. 72-4 at 36.)  Murray stated that there would be no changes until the results of the IME are available.  (Id. at 39.)

On February 27, the Mayo Clinic advised that it had mailed Temple's medical records. (Doc. 65-2 at 13.)  The Mayo Clinic provided 1196 pages of medical records.  (Doc. 65-2 at 58.)  The records revealed that Temple had been previously diagnosed with sleep apnea, non-insulin dependent diabetes and panic attacks.  (Id. at 68-71.)  Temple had previously been treated for right shoulder pain and neck pain.  (Id. at 65-68.)  Temple had also been treated for cervical spine problems, noting degenerative changes.  (Id. at 66.)

On March 5th, Murray issued a notice of claim status with the Industrial Commission of Arizona ("ICA") denying Temple disability benefits.  (Doc. 72-11.) On March 6th, the ICA sent its notice of injury.  (Doc. 65-2 at 94.)  On March 9th, Murray notified Temple of the denial pending the IME, scheduled for March 29th.

On March 8th, Temple treated with Dr. Mookadam regarding complaints concerning her left knee, back, neck and left shoulder.  (Doc. 72-3 at 22-27.)  Dr. Mookadam noted that

1    Temple is not able to walk, work, or sleep without pain.  (Id.)  Dr. Mookadam later testified

2    that she believed Temple's injuries were not pre-existing and were related to the fall at work.

3    (Doc. 72-8 at 6.)  Dr. Mookadam had an MRI taken, which showed a meniscal tear in

4    Temple's left knee, which was a new injury since the time that she last treated her before her

5    fall at work.  (Id. at 6-7.)

6         On March 13th, Murray discussed Temple's case with the ICA regarding why

7    Temple's claim was denied.  Referencing the recently received medical records, Murray

8    contended that Temple's complex medical history caused her to request a second opinion and

9    schedule an IME.  (Doc. 72-4 at 40-41.)  Murray's claim notebook notes the basis for

10   denial:"denied pending IME and investigation of medical history." (Doc. 72-4 at 43.)

11        On March 29th, Temple forgot and did not attend the IME, which had to be

12   rescheduled for April 30th.  (Doc. 72-4 at 41; Doc. 65-1 at 15.)  The physician at the IME,

13   Dr. Zoltan, determined that as a result of the compensable injury, Temple sustained sprains

14   of the left knee, back, neck and shoulder.  (Doc. 72-10.)  Subsequently, Defendants accepted

15   Temple's claim and on May 4th paid Temple her entitled disability benefits.  (Doc. 72-4 at

16   46-47.)

17                              **STANDARD OF REVIEW**

18        *Summary Judgment*

19        A court must grant summary judgment if the pleadings and supporting documents,

20   viewed in the light most favorable to the nonmoving party, show "that there is no genuine

21   issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

22   R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v.

23   Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law determines

24   which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also

25   Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the outcome of the suit

26   under the governing law will properly preclude the entry of summary judgment."  Anderson,

27   477 U.S. at 248.  The dispute must also be genuine, that is, the evidence must be "such that

28   a reasonable jury could return a verdict for the nonmoving party."  Id.; see Jesinger, 24 F.3d

1  at 1130.

2      A principal purpose of summary judgment is "to isolate and dispose of factually
3  unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate
4  against a party who "fails to make a showing sufficient to establish the existence of an
5  element essential to that party's case, and on which that party will bear the burden of proof
6  at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir.
7  1994). The moving party need not disprove matters on which the opponent has the burden
8  of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may
9  not rest upon the mere allegations or denials of the party's pleadings, but must set forth
10  "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus.
11  Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963)
12  (amended 2010)) ; Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).
13  The non-movant's bare assertions, standing alone, are insufficient to create a material issue
14  of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247–48.

15      *Insurance Bad Faith*

16      "An insurance contract is not an ordinary commercial bargain; implicit in the contract
17  and the relationship is the insurer's obligation to play fairly with its insured." Zilisch v. State
18  Farm Mut. Auto. Ins. Co., 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (further quotation
19  omitted). Although insurers do not owe fiduciary duties to their insureds, they do owe some
20  duties of a fiduciary nature including equal consideration, fairness and honesty. Id. The
21  insurer is obligated to conduct a prompt and adequate investigation, to act reasonably in
22  evaluating the insured's claim, and to promptly pay a legitimate claim. Id. at 238, 995 P.2d
23  at 280.

24      "An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes
25  a claim (an 'objective' test), and either knows it is acting unreasonably or acts with such
26  reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." Nardelli
27  v. Metro. Group Prop. & Cas. Ins. Co., 230 Ariz. 592, 597-98, 277 P.3d 789, 794-95 (App.
28  2012) (citing Zilisch, 196 Ariz. at 238, 995 P.2d at 280). The objective and subjective

1    elements of bad faith are applied to both the insurer's evaluation of the claim and the

2    insurer's claims handling process. <u>See</u> <u>Deese v. State Farm Mutual Auto. Ins. Co.</u>, 172 Ariz.

3    504, 507, 838 P.2d 1265, 1268 (1992); <u>see also</u> <u>Zilisch</u>, 196 Ariz. at 238, 995 P.2d at 280.

4        The insurer may challenge claims regarding coverage which are fairly debatable.

5    <u>Zilisch</u>, 196 Ariz. at 237, 995 P.2d at 279. To determine fair debatability, the Court first

6    looks to whether the insurer's actions were objectively reasonable, which is based upon a

7    simple negligence standard–whether the insurance company acted in a manner consistent

8    with the way a reasonable insurer would be expected to act under the circumstances. <u>See</u>

9    <u>Trus Joist Corp. v. Safeco Ins. Co. of Am.</u>, 153 Ariz. 95, 104, 735 P.2d 125, 134 (App.

10   1986).

11       If the insurer acted objectively unreasonably, then the Court moves to the subjective

12   inquiry and determines if the insurer knew or was conscious that its conduct was

13   unreasonable or acted with such reckless disregard that such knowledge may be imputed to

14   it. <u>Id.</u>  Generally, the insurer's "belief in fair debatability 'is a question of fact to be

15   determined by the jury.'" <u>Zilisch</u>, 196 Ariz. at 237, 995 P.2d at 279 (citing <u>Sparks v.</u>

16   <u>Republic Nat'l Life Ins. Co.</u>, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982).  However, if

17   the insured offers no significantly probative evidence that calls into question the insurer's

18   subjective belief in fair debatability, the court may rule on the issue as matter of law. <u>See</u>

19   <u>Knoell v. Metropolitan Life Ins. Co.</u>, 163 F. Supp.2d 1072, 1076 (D. Ariz. 2001); <u>see also</u>

20   <u>Aetna Cas. & Sur. Co. v. Superior Court In & For Cnty. Of Maricopa</u>, 161 Ariz. 437, 440,

21   778 P.2d 1333, 1336 (App. 1989) (stating that "there are times when the issue of bad faith

22   is not a question appropriate for determination by the jury.").

23       *Punitive Damages*

24       In a bad faith tort case against an insurance company, punitive damages may only be

25   awarded if the evidence reflects "something more" than the conduct necessary to establish

26   the tort. <u>Rawlings v. Apodaca</u>, 151 Ariz. 149, 160, 726 P.2d 565, 576 (1986). In <u>Rawlings</u>,

27   the Arizona Supreme Court explained the parameters of punitive damages as follows:

28       We restrict [the availability of punitive damages] to those cases in which the

- 11 -

1
2
3
4

> defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind . . . [P]unitive damages will be awarded on proof from which the jury may find that the defendant was 'aware of and consciously disregard[ed] a substantial and unjustifiable risk that' significant harm would occur.

151 Ariz. at 162, 726 P.2d at 578 (citations omitted). Summary judgment for defendant on the issue of punitive damages must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence; summary judgment should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence. Thompson v. Better–Bilt Aluminum Prod. Co., 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992). The court construes the evidence and all reasonable inferences drawn from the evidence in a light most favorable to the non-moving party. Id.

## DISCUSSION

### Insurance Bad Faith–Defendants' Denial and Processing of Claim

"[F]ederal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003). Thus, the Court will apply Arizona substantive law to this diversity action.  Under Arizona law, a workers' compensation claimant can bring an action against her employer's workers' compensation insurer for breach of the duty of good faith and fair dealing. See Mendoza v. McDonald's Corp., 222 Ariz. 139, 149, 213 P.3d 288, 298 (App. 2009).  The Court further notes that Hartford, the insurer, may be liable for Gallagher Bassett's actions since it cannot delegate its duty of good faith.  See Walter v. Simmons, 169 Ariz. 229, 238, 818 P.2d 214, 223 (App. 1991) ("[W]e hold that, although an insurer may delegate the performance of its duty of good faith to a non-servant, it remains liable for the actions taken by this delegate because the duty of good faith itself is non-delegable.").[2]

Gallagher Bassett contends that it is entitled to summary judgment because it conducted a proper investigation into Temple's workers' compensation claim, that their

---

[2]Because the actions taken on behalf of Hartford were taken by its agent, Gallagher Bassett, the Court will refer to "Gallagher Bassett" rather than collectively "Defendants."

1    March 5, 2012 denial of the claim was not unreasonable because their investigation into the

2    validity of the claim was ongoing, and that once an IME was conducted in April 2012

3    confirming Temple's work related injury, disability compensation was paid to her. (Doc. 64

4    at 5-6.)

5        Gallagher Bassett contends that its investigation of the claim was delayed by the Mayo

6    Clinic who were late in providing all of her medical records. When it finally obtained the

7    records, contrary to Temple's initial denial of similar complaints, the records showed that

8    Temple did have prior medical treatments for similar problems reported in her workers'

9    compensation injury report. Consequently, Gallagher Bassett denied Temple's claim

10   pending the results of the IME. Temple was also part of the delay by failing to attend the

11   initially scheduled IME, which had to be rescheduled. After the results of the IME,

12   Gallagher Bassett accepted and paid her claim.

13       Based on this record, Gallagher Bassett denies engaging in bad faith. (Id. at 6 (citing

14   Desert Mountain Prop. Ltd. P'Ship v. Liberty Mut. Fire Ins. Co., 225 Ariz. 194, 215, 236

15   P.3d 421, 442 (App. 2010) ("An insurer does not commit bad faith by asserting a defense,

16   even when that defense turns out to be invalid or unfounded.") (further citation omitted)).

17       Temple responds arguing that Gallagher Bassett (1) refused to reasonably evaluate or

18   investigate her claim and instead acted as a biased advocate for the insurer; (2) found

19   pre-textual reasons to deny her claim; (3) improperly denied her claim and refused to

20   consider new evidence until after results from the IME, thus using the IME to delay paying

21   her benefits and forcing her through an unnecessary hoop; and (4) denied referral to a pain

22   specialist without proper investigation or evaluation. (Doc. 71 at 8.)

23       Gallagher Bassett replies reiterating its initial arguments. (Doc. 74.)

24       In the context of whether an insurer exercised bad faith in claim evaluation or claim

25   processing, the Court first looks to whether the insurer's actions were objectively reasonable,

26   which is based upon a simple negligence standard, whether the insurance company acted in

27   a manner consistent with the way a reasonable insurer would be expected to act under the

28   circumstances. Trus Joist Corp., 153 Ariz. at 104, 735 P.2d at 134. If the insurer acted

1   objectively unreasonably, then the Court moves to the subjective inquiry and determines if

2   the insurer knew or was conscious that its conduct was unreasonable.  Id.

3        Given that it is Gallagher Bassett's motion for summary judgment, the pleadings and

4   summary judgment documents are viewed in the light most favorable to Temple, the

5   nonmoving party.  In order for a factual dispute to preclude summary judgment, the dispute

6   must be genuine, that is, the evidence must be "such that a reasonable jury could return a

7   verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

8        Based on the underlying facts of this case, the Court will deny Gallagher Bassett's

9   motion for summary judgment.  Viewing the summary judgment evidence in a light most

10  favorable to Temple, on January 9, 2012, Temple had a workplace injury going up the stairs

11  to her workplace falling and injuring her left knee, left hip and her back.  After a co-worker

12  helped her up, she reported her workplace injury to her employer, Stanley Steemer.  Later

13  that day, Temple went in for medical treatment and Doctor Gary Kohring reported that her

14  left knee was strained with swelling and pain radiating into her back. (Doc. 72-2.).  Kohring

15  placed Temple on work restriction until January 11th.  The next day, Temple went to her

16  primary care physicians at the Mayo Clinic and saw Nurse Practitioner Linda Pachuta.

17  Pachuta examined and treated her and placed her on work restriction for the next week,

18  Subsequently, Pachuta faxed a work restriction to Gallagher Bassett indicating that due to

19  a work related injury Temple was restricted from work from January 17th to February 6th.

20  Gallagher Bassett asked for clarification why Temple was unable to work.  Pachuta faxed a

21  second work restriction indicating that due to Temple's work related injury she was unable

22  to sit at a desk, walk up stairs, or stand for long periods of time due to worsening pain.

23       Without first speaking with Pachuta, Adjuster Murray testified that Pachuta's work

24  restrictions were unreasonable.  Murray testified that she did not accept Temple's claim for

25  disability benefits due to lack of supporting documentation of a work related injury. Murray

26  could not describe what additional information she needed to accept Temple's disability

27  benefits claim. "Q: As of -- and as far as something in the report, something that was missing,

28  what did you indicate that you needed to know that was unclear at this point? Having gotten

1   documents from the medical doctors, having talked to the employee, having talked to the
2   employer, what else did you need? A: I wouldn't be able to answer that." (Doc. 72-5 at 8.)
3   Without the benefit of any medical training and without a supporting medical opinion,
4   Murray refused to accept Temple's disability benefits claim. (Id. at 6-7, 11-12.) Murray also
5   improperly denied Pachuta's referral of Temple to a pain specialist without investigation.
6   Murray simply concluded that she did not believe this was going to benefit Temple.

7       Based on Murray's investigation, Temple's workers' compensation expert, Frank
8   Weedon, opined that Murray failed to apply the medical facts to the insurer's obligation to
9   pay disability benefits. (Doc. 72-6.)  Weedon further opined that the refusal to pay workers'
10  compensation benefits to Temple was a direct result of the failure to conduct a reasonable
11  investigation and the failure to accept the opinions of the doctors assigned to Temple's care
12  that Temple's injuries were work related. (Id.)  According to Weedon, an adjuster may not
13  refuse to accept reasonable information obtained during her contact with the treating doctors.
14  (Id.)

15      Under Arizona bad faith principles, an insurance company must act in a manner
16  consistent with the way a reasonable insurer would be expected to act under the
17  circumstances. Trus Joist Corp., 153 Ariz. at 104, 735 P.2d at 134.  Although an insurer does
18  not owe fiduciary duties to its insured, it does owe some duties of a fiduciary nature
19  including equal consideration, fairness and honesty.  Zilisch, 196 Ariz. at 237, 995 P.2d at
20  279.   The insurer is obligated to conduct a prompt and adequate investigation, to act
21  reasonably in evaluating the insured's claim, and to promptly pay a legitimate claim.  Id. at
22  238, 995 P.2d at 280.

23      Here, viewed in the light most favorable to Temple, a reasonable jury could conclude
24  that the insurer failed to conduct a reasonable investigation and failed to accept the opinions
25  of the doctors evaluating Temple's care. The Court finds that a reasonable jury could
26  determine that the insurer acted objectively unreasonably toward Temple in denying her
27  workers' compensation claim.

28      The second prong considers whether the insurer subjectively knew that it was acting

1    unreasonably or acted with such reckless disregard that such knowledge may be imputed to

2    it. Nardelli, 230 Ariz. at 597-98, 277 P.3d at 794-95.  Generally, an insurer's founded belief

3    is a question of fact to be determined by the jury. Zilisch, 196 Ariz. at 237, 995 P.2d at 279.

4    However, if Temple has offered no significantly probative evidence that calls into question

5    the insurer's subjective founded belief, the Court may rule on the issue as a matter of law.

6    See Knoell, 163 F. Supp.2d at 1076.

7        Here, Temple has offered significantly probative evidence regarding the insurer's

8    subjective belief that it was conscious of its unreasonable conduct.  On February 21st,

9    Murray spoke with Pachuta about Murray's surveillance information regarding Temple

10   moving about freely in and out of her car.  Despite this information, Pachuta stated to Murray

11   that she would not change Temple's work restrictions.  On February 24th, despite having the

12   Mayo Clinic's medical statement that the injury was work related, Murray denied Temple's

13   claim pending the IME.  Murray later testified that she denied the claim due to the lack of

14   medical records.  Subsequently, when Murray obtained all of Temple's medical records from

15   the Mayo Clinic, she changed her denial rationale and stated that Temple's complex medical

16   history caused her to request a second opinion and schedule an IME.  The Court finds that

17   a reasonable jury could determine that the insurer subjectively knew that it was acting

18   unreasonably toward Temple in the change of its position in order to wrongfully deny

19   Temple's workers' compensation claim.  See Rawlings, 151 Ariz. at 160, 726 P.2d at 576

20   (stating that the founded belief is absent when the insurer either knows that its position is

21   groundless or when it fails to undertake an investigation adequate to determine whether its

22   position is tenable).

23       Furthermore, Arizona law recognizes that subsequent workplace injuries can

24   aggravate pre-existing injuries and coverage for the aggravated injury properly rests with the

25   workers' compensation insurer.  See Indus. Indemnity Co. v. Indus. Comm. of Ariz., 152

26   Ariz. 195, 199, 731 P.2d 90, 94 (App. 1986).  Based on this legal principle, the Court finds

27   that Murray's change in position from lack of medical documentation to review of Temple's

28   complex medical history does not change the fact that Gallagher Bassett was already

1   responsible as Temple's insurer, and continued to be responsible after receipt of the Mayo

2   Clinic records; Temple was entitled to disability benefits.

3   Moreover, the Court also finds that a failure to investigate theory may result in some

4   overlap in the first two elements of insurance bad faith analysis.  See Demetrulias v. Wal

5   Mart, 917 F. Supp.2d 993, 1007 (D. Ariz. 2013). Thus, because Temple proceeds on the

6   theory that her claim was denied because the insurer failed to adequately investigate her

7   claim, the evidence may support both the objective unreasonableness of the insurer's actions

8   and also the existence of the subjective conscious knowledge by the insurer.  See id.

9   Based on this evidence, the Court finds that Temple has offered significantly probative

10  evidence regarding the insurer's subjective belief that it was conscious of its unreasonable

11  conduct. Thus, the facts regarding the second prong of insurance bad faith will need to be

12  resolved by the jury.

13  *Aiding and Abetting*

14  In Arizona, claims of aiding and abetting tortious conduct require proof of three

15  elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2)

16  the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty;

17  and (3) the defendant must substantially assist or encourage the primary tortfeasor in the

18  achievement of the breach.  See Wells Fargo Bank v. Arizona Laborers, Teamsters, and

19  Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 483, 38 P.3d 12, 23

20  (2002).  The party charged with the tort must have knowledge of the primary violation, and

21  knowledge may be inferred from the circumstances. Id. Aiding and abetting liability is

22  therefore based on proof of scienter. Id.

23  All Defendants contend that they are entitled to judgment as a matter of law regarding

24  Temple's aiding and abetting claims against Gallagher Bassett and Murray because aiding

25  and abetting is a form of secondary liability and there must first be a primary violation by

26  another party, and the defendant must be aware of it.  (Doc. 64 at 8.)  Defendants further

27  contend that without any evidence that Hartford, as the alleged primary tortfeasor, engaged

28  in bad faith claims handling, secondary liability cannot attach to Gallagher Bassett or Murray

for aiding and abetting.  (Id. at 9.)  According to Defendants, the fact that Hartford as an insurer could not delegate its duty to act in good faith to Gallagher Bassett and Murray does not mean there is a legal distinction between the actions of Hartford, Gallagher Bassett and Murray.  (Id.)  Further, even if there was a distinction, Temple's bad faith claim is based on the conduct of Gallagher Bassett and Murray, not Hartford, and thus Gallagher Bassett and Murray could not "know" that the primary tortfeasor's conduct constituted a breach of duty.

Temple contends that "[a]s a general principle, agents such as Gallagher Bassett and Murray are liable to third parties harmed by the agent's tortious conduct, even when the conduct occurs within the scope of the agency." (Doc. 71 at 15, (citing Morrow v. Boston Mut. Life. Ins. Co., No. CV 06-2635-PHX-SMM, 2007 WL 3287585 (D. Ariz. Nov. 5, 2007) (relying on Restatement (Third) Agency § 7.01)).)  Similarly, Temple contends that an agent is not excused from responsibility for tortious conduct because she acted for her principal. (Doc. 71 at 15 (citing Warner v. Southwest Desert Images, LLC, 218 Ariz. 121, 127, 180 P.3d 986, 992 (App. 2008)).)

The Court agrees with Temple that Defendants are not entitled to summary judgment on Temple's aiding and abetting claims against Gallagher Bassett and Murray.  An agent can be held liable for aiding and abetting an insurer's violations of the duty of good faith and fair dealing.  See Inman v. Wesco, No. CV 12-2518-PHX-GMS, 2013 WL 2635603 (D. Ariz. June 12, 2013) (relying on Morrow and Smith v. Country Mutual Ins. Co., No. CV 12-2351-PHX-SRB (Jan. 10, 2013).)  The Inman court made clear that aiding and abetting is not barred simply because a person worked for the alleged primary tortfeasor and was acting within the scope of her employment.

*Punitive Damages*

Defendants argues that they are entitled to summary judgment as to Temple's punitive damages claim because Temple is unable to establish that Defendants acted with the requisite ill intent to support punitive damages. (Doc. 64 at 12-16.)  Defendant contends that even if its conduct supports Temple's insurance bad faith allegations, which it does not concede, this alone is insufficient for an award of punitive damages.  (Id.)

In a bad faith tort case against an insurance company, punitive damages may only be awarded if the evidence reflects "something more" than the conduct necessary to establish the tort. Rawlings, 151 Ariz. at 160, 726 P.2d at 576.  In Rawlings, the Arizona Supreme Court explained the parameters of punitive damages as follows:

> We restrict [the availability of punitive damages] to those cases in which the defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind. . . . [P]unitive damages will be awarded on proof from which the jury may find that the defendant was 'aware of and consciously disregard[ed] a substantial and unjustifiable risk that' significant harm would occur.

Id. at 162, 726 P.2d at 578.  (citations omitted).  Summary judgment on the issue of punitive damages must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence; summary judgment should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence. See Thompson v. Better-Bilt Aluminum Prod. Co., 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992). The court construes the evidence and all reasonable inferences drawn from the evidence in a light most favorable to the non-moving party.  Id.

To establish a claim for punitive damages, the evidence must support a showing that Defendant either (1) intended to cause injury; (2) engaged in wrongful conduct motivated by spite or ill will; or (3) acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others, even though defendant had neither desire nor motive to injure.  See Bradshaw v. State Farm Mut. Auto. Ins. Co., 157 Ariz. 411, 422, 758 P.2d 1313, 1324 (1988). In the Court's threshold review of the evidence, the Court finds that the third avenue presents a close question.  To obtain summary judgment on the punitive damages issue in the instant case, Defendants must show there is a complete failure of proof, Celotex, 477 U.S. at 323, such that no reasonable jury could find the requisite evil mind required for punitive damages by clear and convincing evidence.  See Thompson, 171 Ariz. at 558, 832 P.2d at 211.

Here, when the Court adds up all the evidence against the Defendants, it presents a picture of Defendants doing all they can to avoid paying Temple her entitled disability

benefits.  This includes trying to talk Temple's medical providers into changing their medical work restrictions, not accepting disability benefits despite not having medical evidence to support the denial, hiring surveillance and asking for good info to support Temple's return to work, changing positions in support of their rationale for the denial of disability benefits. On the basis of this and other evidence, the Court finds that taking the evidence before it and its inferences in favor of Temple, a reasonable jury could conclude by clear and convincing evidence that Defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of Temple, even though Defendant had neither desire nor motive to injure.

## CONCLUSION

Accordingly, on the basis of the foregoing,

**IT IS HEREBY ORDERED** denying Defendants' motion for summary judgment. (Doc. 64.)  The Court denies Defendants' motion for summary judgment on Temple's bad faith claim, her aiding and abetting claims against Gallagher Bassett and Murray, and her request for punitive damages.

**IT IS FURTHER ORDERED** denying Defendants' motion to strike Temple's Insurance Bad Faith Expert, Frank Weedon.  (Doc. 66.)

**IT IS FURTHER ORDERED** setting this matter for a Final Pretrial Conference on **Tuesday, October 28, 2014 at 2:00 p.m.** This matter appearing ready for trial, a Final Pretrial Conference shall be held in Courtroom 401, on the fourth floor of the Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003. The attorneys who will be responsible for the trial of the case shall attend the Final Pretrial Conference. Counsel shall bring their calendars so that trial scheduling can be discussed.

**IT IS FURTHER ORDERED** that, if this case shall be tried to a jury, the attorneys who will be responsible for the trial of the lawsuit shall prepare and sign a <u>Proposed Pretrial Order</u> and submit it to the Court on **<u>Friday, October 17, 2014.</u>**

**IT IS FURTHER ORDERED** that the content of the Proposed Pretrial Order shall include, but not be limited to, that prescribed in the <u>Form of Pretrial Order</u> attached hereto.

Statements made shall not be in the form of a question, but should be a concise narrative statement of each party's contention as to each uncontested and contested issue.

**IT IS FURTHER ORDERED** pursuant to Federal Rule of Civil Procedure 37(c) that the Court will not allow the parties to offer any exhibits, witnesses, or other information that were not previously disclosed in accordance with the provisions of this Order and/or the Federal Rules of Civil Procedure and/or not listed in the Proposed Pretrial Order, except for good cause.

**IT IS FURTHER ORDERED** directing the parties to exchange drafts of the Proposed Pretrial Order **no later than seven (7) days before the submission deadline**.

**IT IS FURTHER ORDERED** that the parties shall file and serve all motions in limine no later than **Friday, October 3, 2014.** Each motion in limine shall include the legal basis supporting it.  Responses to motions in limine are due **Friday, October 10, 2014.**  No replies will be permitted.  The attorneys for all parties shall come to the Final Pretrial Conference prepared to address the merits of all such motions.

**IT IS FURTHER ORDERED** directing the parties to complete the following tasks by the time of the filing of the Proposed Pretrial Order if they intend to try the case before a jury:

(1)     The parties shall <u>jointly</u> file a description of the case to be read to the jury.

(2)     The parties shall <u>jointly</u> file a proposed set of voir dire questions.  The voir dire questions shall be drafted in a neutral manner.  To the extent possible, the parties shall stipulate to the proposed voir dire questions.  If the parties have any disagreement about a particular question, the party or parties objecting shall state the reason for their objection below the question.

(3)     The parties shall file a proposed set of <u>stipulated</u> jury instructions. The instructions shall be accompanied by citations to legal authority.  If a party believes that a proposed instruction is a correct statement of the law, but the facts will not warrant the giving of the instructions, the party shall so state.  The party who believes that the facts will not warrant the particular instruction shall provide an alternative

instruction with appropriate citations to legal authority.

(4)     Each party shall submit a form of verdict to be given to the jury at the end of the trial.

**IT IS FURTHER ORDERED** directing the parties to submit their proposed joint statement of the case, joint voir dire questions, stipulated jury instructions, and verdict forms.

**IT IS FURTHER ORDERED** that if the case will be tried to the Court, rather than to a jury, <u>instead of</u> filing a Proposed Pretrial Order, each party shall submit proposed findings of fact and conclusions of law by the same date the Proposed Pretrial Order is due.

**IT IS FURTHER ORDERED** that the parties shall keep the Court apprised of the possibility of settlement and should settlement be reached, the parties shall file a Notice of Settlement with the Clerk of the Court.

**IT IS FURTHER ORDERED** that this Court views compliance with the provisions of this Order as critical to its case management responsibilities and the responsibilities of the parties under Rule 1 of the Federal Rules of Civil Procedure.

DATED this 26th day of August, 2014.

Stephen M. McNamee
Senior United States District Judge

1

2

3

4

5

6          **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9   ,                                    )   No. CV -PHX-SMM
                                         )
10              Plaintiff,               )   **PROPOSED   PRETRIAL   FORM   OF**
                                         )   **ORDER**
11  vs.                                  )
                                         )
12                                       )
                                         )
13  ,                                    )
              Defendant.                 )
14                                       )
                                         )
15  _____)

16          Pursuant to the Scheduling Order, the following is the joint Proposed Final Pretrial

17  Order   to   be   considered   at   the   Final   Pretrial   Conference   set   for

18  _____, _____ .

19      A.  **COUNSEL FOR THE PARTIES**

20          (Include mailing address, office phone and fax numbers).

21          Plaintiff(s):

22          Defendant(s):

23      B.  **STATEMENT OF JURISDICTION**.

24          Cite the statute(s) which gives this Court jurisdiction.

25          (e.g., Jurisdiction in this case is based on diversity of citizenship under Title 28

26          U.S.C. §1332.)

27          Jurisdiction (is/is not) disputed.

28

(If jurisdiction is disputed, the party contesting jurisdiction shall set forth with specificity the bases for the objection.)

C.  **NATURE OF ACTION**.

Provide a concise statement of the type of case, the cause of the action, and the relief sought.

(e.g., - This is a products liability case wherein the plaintiff seeks damages for personal injuries sustained when he fell from the driver's seat of a forklift. The plaintiff contends that the forklift was defectively designed and manufactured by the defendant and that the defects were a producing cause of his injuries and damages.)

D.  **CONTENTIONS OF THE PARTIES**.

With respect to each count of the complaint, counterclaim or cross-claim, and to any defense, affirmative defense, or the rebuttal of a presumption where the burden of proof has shifted, the party having the burden of proof shall list the elements or standards that must be proved in order for the party to prevail on that claim or defense. Citation to relevant legal authority is required.

(e.g., In order to prevail on this products liability case, the plaintiff must prove the following elements . . . .

In order to defeat this products liability claim based on the statute of repose, the defendant must prove the following elements . . . .)

E.  **STIPULATIONS AND UNCONTESTED FACTS**

1. The following facts are admitted by the parties and require no proof:

2. The following facts, although not admitted, will not be contested at trial by evidence to the contrary:

F.  **CONTESTED ISSUES OF FACT AND LAW**

1. The following are the issues of fact to be tried and decided: (Each issue of fact must be stated separately and in specific terms. Each parties' contention as to each issue must be set forth with respect to each and every issue of fact). E.g., Issue # 1: Whether Plaintiff used due care.

> Plaintiff Contends: Plaintiff looked both ways before stepping into the street . . . .
>
> Defendant Contends: Plaintiff was chasing a ball and darted out into the street without looking . . . .

2. The following are the issues of law to be tried and determined: (Each issue of law must be stated separately and in specific terms. Each parties' contention as to each issue must be set forth with respect to each and every issue of law). E.g., Issue # 1: Whether Plaintiff's suit is barred by the doctrine of laches.

> Plaintiff Contends: . . .
>
> Defendant Contends: . . .

G.  **LIST OF WITNESSES**.

A jointly prepared list of witnesses and their respective addresses, identifying each as either plaintiff's or defendant's, and indicating whether a fact or expert witness, must accompany this proposed order. If a witness' address is unknown, it should be so stated. A brief statement as to the testimony of each witness must also be included. Additionally, the parties shall designate which witnesses (1) shall be called at trial, (2) may be called at trial, and (3) are unlikely to be called at trial.

Additionally, the parties shall include the following text in this portion of the Proposed Pretrial Order:

The parties understand that the Court has put them on notice that they are responsible for ensuring that the witnesses they want to put on the stand to testify

are subpoenaed to testify, regardless of whether the intended witness is listed as a witness for the plaintiff(s) or the defendant(s). Simply because a party lists a witness does not mean that the witness will be called. Therefore, a party should not rely on the listing of a witness by the opposing party as an indication that the witness will be called. To the extent possible, the parties shall stipulate to the witnesses who will be called to testify.

H. **LIST OF EXHIBITS**.

1. The following exhibits are admissible in evidence and may be marked in evidence by the Clerk:

a. Plaintiff's Exhibits:

b. Defendant's Exhibits:

2. As to the following exhibits, the parties have reached the following stipulations:

a. Plaintiff's Exhibits:

b. Defendant's Exhibits:

3. As to the following exhibits, the party against whom the exhibit is to be offered objects to the admission of the exhibit and offers the objection stated beneath:

a. Plaintiff's Exhibits:

(E.g., City Hospital records of Plaintiff from March 6, 1985 through March 22, 1985. Defendant objects for lack of foundation because . . . . (the objection must specify why there is a lack of foundation)).

b. Defendant's Exhibits:

(E.g., Payroll records of Plaintiff's employer which evidences payment of Plaintiff's salary during hospitalization and recovery. Plaintiff objects on the ground of relevance and materiality because (the objection must specify why there is a relevancy or materiality problem)).

I.   **DEPOSITIONS TO BE OFFERED**.

The parties shall list the depositions to be used at trial. The portions to be read at trial shall be identified by page and line number. Counsel should note objections to deposition testimony by writing the objection in the margins of that portion of the text of the deposition to which the objection is made. Moreover, these objections shall be explained in this portion of the Proposed Pretrial Order. As is the Court's practice at trial, it is <u>not sufficient</u> for an objecting party to simply state perfunctory grounds for an objection (e.g., "hearsay" or "lack of foundation") contained in the Proposed Pretrial Order. Each party must explain the basis for each perfunctory objection (e.g., <u>why</u> it is hearsay, <u>why</u> it lacks foundation, <u>why</u> it is irrelevant).

J.   **MOTIONS IN LIMINE**. Motions in limine shall be served, filed, and responded to in accordance with the instructions contained in the Order Setting Final Pretrial Conference.

K.   **LIST OF ANY PENDING MOTIONS**

L.   **PROBABLE LENGTH OF TRIAL**

M.   **JURY DEMAND** - A jury trial (has) (has not) been requested. If a jury trial was requested, (indicate the appropriate selection):

1. the parties stipulate the request was timely and properly made;

2. the (Plaintiff or Defendant) contends the request was untimely made because: (explain why request was untimely); or

3. the (Plaintiff or Defendant contends that although the request for trial by jury was timely, the request is improper as a matter of law because: (indicate the legal basis why a jury trial would be improper).

For a Bench Trial

N-1. **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** shall be filed and served by each party in accordance with the instructions contained

- 5 -

in the Order Setting Final Pretrial Conference.

For a Jury Trial

N-2. **STIPULATED JURY INSTRUCTIONS, PROPOSED VOIR DIRE QUESTIONS, AND PROPOSED FORMS OF VERDICT** shall be filed in accordance with the instructions contained in the Order Setting Final Pretrial Conference.

O. **CERTIFICATIONS**. The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

1. All discovery has been completed.

2. The identity of each witness has been disclosed to opposing counsel.

3. Each exhibit listed herein (a) is in existence; (b) is numbered; and (c) has been disclosed and shown to opposing counsel.

4. The parties have complied in all respects with the mandates of the Court's Rule 16 Order and Order Setting Final Pretrial Conference.

5. [Unless otherwise previously ordered to the contrary], the parties have made all of the disclosures required by the Federal Rules of Civil Procedure.

APPROVED AS TO FORM AND CONTENT:

_____   _____

Attorney for Plaintiff                          Attorney for Defendant

Based on the foregoing,

**IT IS ORDERED** that this Proposed Pretrial Order jointly submitted by the parties is hereby **APPROVED** and is thereby **ADOPTED** as the official Pretrial Order of this Court.

DATED this _____ day of _____, _____.

_____
Stephen M. McNamee
Senior United States District Judge